UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

LAMAR NASHAWN DORSEY,

         Plaintiff,

v.                                    Civil Action No. 2:19-00608

CPL. CHRISTOPHER RANDOLPH,[1]

         Defendant,

<u>MEMORANDUM OPINION AND ORDER</u>

         Pending is Defendant Christopher Randolph's Motion for
Summary Judgment (ECF No. 41), filed March 7, 2022.  Plaintiff
Lamar Nashawn Dorsey filed a response to the motion (ECF No. 43)
on March 21, 2022, and Randolph filed his reply (ECF No. 44) on
March 23, 2022.

I.   Background

         On January 28, 2018, while incarcerated at
Southwestern Regional Jail, Plaintiff Lamar Nashawn Dorsey
("Dorsey") was in possession of meth.  Dorsey Dep. 22:12-14,
30:19-24, ECF No. 43-1.  After using some of the drugs and
sharing some with others, he ran out.  Id. at 22:14-15.

---

[1] Corporal Christopher Randolph's name is incorrectly spelled as
"Randoff" in Dorsey's complaint.  The court will direct the
Clerk to have the caption reflect the correct spelling of
Corporal Randolph's name.

Thereafter, six inmates came into his cell intending to "break bread."[2]  Id. at 22:15–16.  Dorsey testified that the six men started beating him up.  Id. at 22:14–17.  After this incident, Dorsey was moved to "B2," a lock-down pod, along with his cellmate and two of the inmates who had assaulted him.  Id. at 22:17–20.

The next morning, January 29, 2018, one of those inmates came into his cell, once again asking for drugs.  Id. at 23:1–4.  A couple of minutes after Dorsey informed the man that he did not have any more drugs, Dorsey said he overheard the whole pod was plotting to "jump" him.  Id. at 23:4–7.

Dorsey called out to the corrections officers that he was suicidal, and an officer retrieved him from the pod and told Dorsey he would take him "up to the psych."  Id. at 23:8–10.  Dorsey explained that he was not actually suicidal, but that he did not feel safe in his cell and that he "felt like [he] was about to get jumped again."  Id. at 23:10–13.

Nevertheless, the officer took Dorsey to see the jail psychiatrist.  Id. at 23:13. Dorsey told her about being assaulted, and he testified that she told him she was "going to

---

[2] Presumably, this means that the men were hoping to share some of Dorsey's meth.

move [him] somewhere safe." Id. at 23:13–15.

After visiting the psychiatrist, Dorsey was placed in an interview room. Id. at 23:16. Three or four hours later, Corporal Randolph entered the room and told Dorsey that he was going back to B2. Id. at 23:19–23. Dorsey refused the order, telling Corporal Randolph that he did not feel safe in that pod. Id. at 23:23–24:2. Corporal Randolph left the room and then returned with a "can of mace."[3] Id. at 24:3–4.

When plaintiff signed the pro se complaint in this case under penalty of perjury on July 15, 2019, he wrote in handwritten script that Corporal Randolph instructed him to go back to his cell twice before spraying him after he refused to do so:

> About 4pm Cpl Randoff said "You going back to B-2." I stated there going to assault me. I state there going to assault me again. So Cpl Randoff went to grab a can of O'C pepper spray. "He stated your going back to B-2." I stated I'm scared. So he spray me with O'C spray in the face . . .

Compl. 5.

---

[3] The classification of the spray used by Corporal Randolph has not been established by evidence. Dorsey refers to it as "mace" in his deposition. Corporal Randolph refers to it as "O.C." in his briefing. See ECF No. 42, at 2. The court makes no findings regarding the quality or nature of the spray used on Dorsey.

Two and a half years later, after plaintiff had engaged an attorney, plaintiff testified at his deposition as though he was not asked a second time to return to his cell but upon Corporal Randolph's return was sprayed without warning. Dorsey Dep. 24:3–4, 27:2–6, 52:4–53:13, 55:3–5.

Dorsey estimated that he was hit in the face with a three to four second burst of spray. Id. at 27:23–28:6; 53:15–17. As a result of the spray, Dorsey experienced physical pain for three days and could not sleep, but he did not suffer any permanent injury. Id. at 29:3–30:1.

After being sprayed, Dorsey was taken to the nurse's station, decontaminated in the shower, and then placed outside for two hours in fresh air. Id. at 24:4–11, 28:11–13. From the time Dorsey left the B2 pod to see the psychiatrist through the time he was placed outside for decontamination, he was free from physical restraints. Id. at 26:14–27:1, 28:14–23.

Dorsey testified that he filed a grievance related to the incident and that he received a response from a Sergeant Lambert. Id. at 25:6–21. When asked what he did after he received the response, he stated, "Nothing. I just stayed in my pod." Id. at 25:22–24. When asked whether he pursued the grievance any further he testified:

> You couldn't pursue it no further.  He didn't say
> you could pursue it to an administrator, because
> at the time, they were called administrators.
> And there wasn't no paper grievances, sir.

Id. at 26:2–4.

Dorsey filed a pro se complaint against Corporal Randolph and Southwestern Regional Jail with this court on August 21, 2019.  ECF No. 1.  The complaint was filed pro se and was assigned to United States Magistrate Judge Dwane L. Tinsley for proposed findings and recommendation.  On September 15, 2020, Magistrate Judge Tinsley recommended that the court dismiss Southwestern Regional Jail as a defendant and leave the matter referred for additional proceedings concerning Corporal Randolph.  ECF No. 9.  This court adopted Magistrate Judge Tinsley's proposed findings and recommendation on December 1, 2020, and dismissed Southwestern Regional Jail from this action.  ECF No. 16.

In April of 2021, Dorsey retained counsel and the referral to Magistrate Judge Tinsley was vacated.  After summary judgment briefing, Dorsey is once again without counsel and is proceeding pro se.  ECF No. 49; ECF No. 51.

## II.  Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

### III. Analysis

In his motion, Corporal Randolph argues that summary judgment should be granted on three grounds.  First, he asserts that he is entitled to summary judgment because Dorsey failed to exhaust his administrative remedies as required by the Prison Reform Litigation Act.  Second, he argues that he is entitled to summary judgment because he applied force in good faith.  Third, he argues that he is entitled to qualified immunity.  The court notes that Corporal Randolph's argument that his force was applied in good faith is subsumed in the qualified immunity analysis.  Accordingly, the Corporal Randolph's second and third arguments will be addressed together.

### A.    Exhaustion Under the Prison Reform Litigation Act

Pursuant to the Prison Litigation Reform Act ("PLRA") prisoners are prohibited from filing actions under § 1983 "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a).[4]  "Failure to exhaust is an affirmative defense under the PLRA."  Jones v. Bock, 549 U.S. 199, 216 (2007).  Accordingly, the defendant has "the burden of raising

---

[4] Corporal Randolph also argues that exhaustion is required by the West Virginia Prison Litigation Reform Act ("WVPLRA").  ECF No. 42, at 7-8.  The courts notes that it is the federal PLRA that controls in this instance.

and proving the absence of exhaustion." Porter v. Sturm, 781
F.3d 448, 451 (8th Cir. 2015) (citing Jones, 549 U.S. at
211–12).  If the defendant makes such a threshold showing, the
burden then shifts to the plaintiff to show that administrative
remedies were not "available." Baxley v. Jividen, 508 F. Supp.
3d 28, 46 (S.D.W. Va. 2020).

Although it is the PRLA that requires exhaustion, "it
is the prison's requirements, and not the PLRA, that define the
boundaries of proper exhaustion." Jones, 549 U.S. at 218.

Corporal Randolph concedes that Dorsey filed a
grievance, but he argues that Dorsey failed to fully exhaust his
administrative remedies because he "failed to appeal his
grievance to the Chief of Operations, Regional Jail Authority."
ECF No. 42, at 7.  Dorsey contends that he was not required to
appeal his grievance because the jail's grievance process was
"unavailable."  ECF No. 43, at 5–7.

At the time of the incident with Corporal Randolph,
West Virginia Regional Jail Authority Policy and Procedure
Statement 14003 contained the procedures for inmate grievances.
ECF No. 41-2.

Statement 14003 provides "[i]f an inmate wishes to use
the grievance procedure, facility staff will provide the inmate

access to a grievance form." Id. at 3.  The inmate is to complete the form and place it in an envelope addressed to the facility administrator.  Id.  The administrator may then accept or reject the grievance.  Id. at 4.  If the grievance is accepted, the administrator "shall provide a written decision with regard to the grievance to the grieving inmate within two (2) days of the receipt of the investigation report.  Such written decisions shall include a statement of actions taken, the reasons for such actions, and procedures for appeal of the decision."  Id.

The "Appeal Procedure" portion of the policy states, in pertinent part,

1. An inmate who is dissatisfied with the Administrator's decision may appeal such decision to the Chief of Operations, Regional Jail Authority.  Such appeal must be filed in writing within five (5) days of the receipt of the Administrator's decision and must include a copy of the initial complaint and the Administrator's decision.

2. Inmate appeals shall be mailed in accordance with procedures applying to legal correspondence.  Reasonable amounts of postage will be provided to indigent inmates.  Wherever possible, such appeals may be included in daily mail sent to the Central Office by the Jail.

Id. at 5.

Inasmuch as Dorsey admits he did not appeal the denial of his grievance, Corporal Randolph has made a threshold showing that Dorsey did not complete the exhaustion process, and the burden shifts to Dorsey to prove that the exhaustion was unavailable.

The availability of administrative remedies under the PLRA is a question of law for the court. <u>Ray v. Kertes</u>, 130 F. App'x 541, 543–44 (3d Cir. 2005); <u>Baxley</u>, 508 F. Supp. 3d at 47. Administrative remedies are "available" if they are "capable of use to obtain relief." <u>Ross v. Blake</u>, 578 U.S. 632, 643 (2016).

In <u>Ross</u>, the United States Supreme Court explained three circumstance in which administrative remedies are not "available": (1) a remedy is not available if it "operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use"; and (3) remedies are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." <u>Id.</u> at 643–44.[5]

---

[5] Corporal Randolph urges that exhaustion is mandatory.  ECF No. 42, at 7; ECF No. 44, at 1.  Indeed, in <u>Reynolds v. Doe</u>, the Fourth Circuit held that "[e]xhaustion to administrative duties is mandatory, even where the inmate claims that exhaustion would

Dorsey argues that he could not complete the jail's exhaustion procedure because "there was no way to appeal the grievances through the kiosk system that was utilized at the regional jails." ECF No. 43 at 7. Dorsey contends that he is similarly situated with the inmates in Baxley v. Jividen, whose failure to exhaust was excused by a finding that the grievance procedure utilized by the West Virginia Division of Corrections and Rehabilitation[6] ("WVDCR") was not navigable, and thus was unavailable. Id. at 6-7 (citing Baxley, 508 F. Supp. 3d at 51-53).

The Baxley decision involved a putative class action wherein pretrial detainees and convicted inmates in West Virginia Regional Jails asserted claims against the Commissioner of the WVDCR under § 1983 and the Americans with Disabilities Act. Baxley, 408 F. Supp. 3d 28. In that case, Judge Robert C. Chambers analyzed the same grievance procedure at issue in this

_____

be futile." 431 F. App'x 221, 222 (4th Cir. 2011) (citing Booth v. Churner, 532 U.S. 731, 741 n.6 (2001)). Nevertheless, the United States Supreme Court's decision in Ross makes clear that there is an exception to the mandatory language of the PLRA, and that "[a] prisoner need not exhaust remedies if they are not 'available.'" Ross, 578 U.S. at 635.

[6] The West Virginia Division of Corrections and Rehabilitation is the government agency that operates West Virginia's jails and prisons, including the jail Dorsey was incarcerated at, Southwestern Regional Jail.

case and found that the procedure was unavailable.[7]

In doing so, Judge Chambers noted two factors that are particularly relevant in this case.  First, he found that the grievance process set forth in the Inmate Handbook given to inmates was "entirely different from the one that the [commissioner] expected [the inmates] to follow."  Id. at 51. Second, Judge Chambers remarked that despite the fact that the written policy "specifically states that inmates will be provided with the 'procedures for appeal,'. . . no such instructions were provided."  Id. at 52.

The court finds that these same factors lead to a conclusion that the grievance process was similarly unavailable in this case.  Although Dorsey testified that he filed his grievance on a kiosk, see Dorsey Dep. 25:6–11, the written policy furnished by Corporal Randolph describes a paper system whereby inmates are given grievance forms to be placed in envelopes and delivered to jail administrators.  ECF No. 41-2, at 3–4.  That policy further states that inmates will be given a written decision including "a statement of actions taken, the reasons for such actions, and procedures for appeal of the

---

[7] The court notes that in Baxley, the grievance procedure is reproduced from WVDCR's "Inmate Handbook," rather than directly from Policy 14003.  Nevertheless, the grievance procedures are materially identical.

decision." Id. at 4. That fact notwithstanding, Dorsey testified that although he received a response to his grievance from a Sargent Lambert, he was not told he could pursue the grievance any further. Dorsey Dep. at 26:2-4.

Inasmuch as Corporal Randolph does not attempt to dispute Dorsey's testimony, or otherwise explain how Dorsey might have been able to appeal the denial through the electronic kiosk Dorsey used to file his grievance, the court finds that Dorsey exhausted his remedies to the extent they were available to him. See Goebert v. Lee Cnty., 510 F.3d 1312, 1322 (11th Cir. 2008) (finding grievance process was available where inmate "did not know that she should, or could, appeal [the] denial of her complaint").

Accordingly, Corporal Randolph's motion for summary judgment based on failure to exhaust under the PLRA is denied.

B.  **Qualified Immunity**

Section 1983 subjects to civil liability any person who, under color of state law, deprives an individual of his constitutional or federal rights. 42 U.S.C. § 1983. Proving a deprivation of rights, however, is not enough. Qualified immunity is an affirmative defense to Section 1983 that applies when an officer's "conduct does not violate clearly established

statutory or constitutional rights known to a reasonable person," even if the facts "establish that the officer's conduct violated a plaintiff's constitutional rights." <u>Wilson v. Prince George's County</u>, 893 F.3d 213, 219 (4th Cir. 2018); <u>see also</u> <u>Thompson v. Virginia</u>, 878 F.3d 89, 98 (4th Cir. 2017) ("[E]ven if an official has violated an inmate's constitutional right, he is still entitled to immunity if the right was not so clearly established that a reasonable official would understand that what he is doing violates that right." (quotation marks omitted)). "The burden of proving qualified immunity rests on the party seeking to invoke it." <u>Wilson</u>, 893 F.3d at 219.

The court thus proceeds under the familiar two-pronged approach for assessing Section 1983 liability and qualified immunity. First, the court determines whether the officer violated the plaintiff's constitutional or federal rights under the standard of review applicable to the stage of litigation, such as summary judgment. <u>Id.</u>; <u>see also</u> <u>Dean v. Jones</u>, 984 F.3d 295, (4th Cir. 2021) ("On summary judgment, then, the inquiry . . . boils down to whether a reasonable jury could determine that an officer [violated the plaintiff's constitutional or federal rights]."). If the court finds a violation of the plaintiff's rights, then second, the court must determine whether that right

was "clearly established" at the time the conduct took place. Wilson, 893 F.3d at 219.

"The Eighth Amendment protects prisoners from unnecessary and wanton infliction of pain." Thompson, 878 F.3d at 97 (quotation marks omitted). An excessive force claim under the Eighth Amendment inquires "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 98 (quotation marks omitted).

"An inmate's Eighth Amendment excessive force claim involves both an objective and a subjective component." Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019). The objective component is not onerous: it asks merely whether the force applied was "something more than de minimis," id. (quotation marks omitted), "regardless of the extent of the injury," Dean, 984 F.3d at 303. The objective component is readily met in this case because a reasonable jury could find that the three or four second blast that Corporal Randolph sprayed in Dorsey's face constituted more than de minimis force. See id. ("[A] reasonable jury could find that a sustained blast of pepper spray directly to the face constitutes something more than de minimis force.").

The subjective component, however, presents a higher bar: it "asks whether the officers acted with a sufficiently culpable state of mind."  Brooks, 924 F.3d at 112 (quotation marks omitted).  That requisite state of mind is "wantonness in the infliction of pain."  Id.  "And whether such wantonness can be established . . . ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Id. at 113 (quotation marks omitted).  Thus, the line separating good faith from bad faith use of force is, roughly, the permissible motive to "confront immediate risks to physical safety" and to "preserve internal order by compelling compliance with prison rules and procedures" on the one hand, and the impermissible motive to "punish an inmate for intransigence or to retaliate for insubordination" on the other.  Id. at 113 (quotation marks omitted); see Boone v. Stallings, 583 F. App'x 174, 177 (4th Cir. 2014) ("[T]he Eighth Amendment does not permit a correctional officer to respond to a misbehaving inmate in kind.").

To aid in deciding on which side of the line a correctional officer's conduct falls, the United States Supreme Court has outlined four factors to be considered:

> (1) the need for the application of the force;
>
> (2) the relationship between the need and the amount of force that was used;
>
> (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and
>
> (4) any efforts made to temper the severity of a forceful response.

Whitley v. Albers, 475 U.S. 312, 320–21 (1986); Thompson, 878 F.3d at 99.  The Fourth Circuit emphasizes the "non-exclusive[ness]" of those four Whitley factors.  "[O]ther evidence of an impermissible malicious motive, direct or circumstantial, always will be relevant to the Eighth Amendment inquiry."  Dean, 984 F.3d at 309.

At the summary judgment stage, "the inquiry under the subjective component boils down to whether a reasonable jury could determine that an officer acted with malice, applying force punitively and 'for the very purpose of causing harm.'"  Id. at 302 (quoting Whitley, 475 U.S. at 320–21).

As to the first factor, "the need for application of force," and the third factor, "the extent of any reasonably perceived threat that the application of force was intended to

quell," as well as the fourth factor of "temper the severity of a forceful response," Corporal Randolph submits that his use of force was reasonable, and that,

> [t]he threat perceived by Cpl. Randolph is clear. The Plaintiff, an unrestrained convicted felon was simply refusing to leave the interview room and return to his assigned cell, in a lock-down pod.
>
> Prior to discharging the O.C., Cpl. Randolph attempted to temper his response by giving loud, clear verbal commands and officer presence.

ECF No. 42, at 10.

Indeed, Dorsey acknowledged that he refused an order to return to his pod. Dorsey Dep. 27:2-9. Although he stated during his deposition that Corporal Randolph sprayed him in the face without warning, id. at 47:3-5, Dorsey writes in his verified complaint that he was given two instructions to return to his pod before Corporal Randolph employed force, see Compl. 5.

While Dorsey avers that he was not physically or verbally aggressive in his refusal, Dorsey Dep. 27:2-6, the fact remains that he was an unrestrained inmate, who had made a false statement to be removed from his cell and was refusing to return.

18

As to the second Whitley factor, which examines "the relationship between the need and the amount of force that was used," the court notes that there is no evidence that Corporal Randolph used more force than necessary to obtain Dorsey's compliance.

Finally, the court returns to the fourth Whitley factor, "which focuses on corrections officers' efforts to avoid or temper a forceful response." See Brooks v. Johnson, 924 F.3d at 117. First, the injury to Dorsey was temporary and one from which he soon recovered. See supra at 4. Second, inasmuch as Dorsey's complaint states that he was given two direct instructions from the corrections officer before he was sprayed, it is not clear what additional action Corporal Randolph should have been required to take "to secure [Dorsey's] compliance without using violent force." Id.; see Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984) ("When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force."); Lewis v. White, No. 1:07-cv-00348, 2010 WL 2671495, at *3 (S.D. W. Va. 2010) ("[I]t is clear that Plaintiff cannot satisfy the subjective component of

the excessive force analysis.  Although Plaintiff alleges that he was merely asking Defendant White a question, his actions demonstrate that he twice refused to obey a direct order.  . . . It is widely recognized that prison guards may use chemical sprays when reasonably necessary to subdue an insubordinate prisoner because orders must be obeyed, and there are only so many choices available to correctional officers when an inmate refuses." (collecting cases)).

Viewing the facts in the light most favorable to Dorsey, the court finds he has failed to adduce evidence that would be sufficient for a reasonable jury to conclude Corporal Randolph's actions were not made in a good faith effort to restore order, but rather that he acted with malice and "for the very purpose of causing harm," in violation of the Eighth Amendment.  See Dean, 984 F.3d at 303.

Inasmuch as Dorsey has failed to satisfy the first prong of the qualified immunity analysis, Corporal Randolph is entitled to qualified immunity and the court need not answer whether Dorsey's Eighth Amendment right was clearly established.

IV.   Conclusion

For the foregoing reasons, the court ORDERS that Defendant Christopher Randolph's Motion for Summary Judgment (ECF No. 41) be, and it hereby is, granted.

The Clerk is directed to modify the caption in this civil action to identify defendant "Cpl. Randoff" as "Cpl. Christopher Randolph."

The Clerk is further directed to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: August 30, 2022

John T. Copenhaver, Jr.
Senior United States District Judge